**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § § § § § § § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | | |
| **APPROXIMATELY 11,708,872.218564 USDT** | | *CIVIL ACTION NO.* **26-cv-2268** |
| **Defendant, *in rem.*** | | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 11,708,872.218564 USDT, hereinafter referred to as "Defendant Property", and alleges as follows:

## STATEMENT OF THE CASE

1. Criminals believed to be located abroad, their associates, and conspirators together stole funds from multiple U.S. victims. The funds were then laundered through a series of virtual currency addresses, and sometimes virtual currency exchanges, to evade detection and hide the origin of the funds. The United States Secret Service (USSS) and the Federal Bureau of Investigation (FBI), investigated, traced, and seized the Defendant Property, which constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2. The United States of America seeks to lawfully forfeit the Defendant Property to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).

5.      Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.      The United States files this *in rem* forfeiture action to seek forfeiture of Defendant Property as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(h), 2, and 3.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such

offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.     18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.     18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.     18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.     18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of

unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.     18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**PROPERTY INFORMATION**

15.     The Defendant Property is 11,708,872.218564 USDT, which is the equivalent to $11,708,872.218564 in U.S. dollars (USD).  The Defendant Property is associated with virtual currency address: 0xfff8cb22789fafb30492cc4264a711c2ed1973ee (Subject Virtual Currency Address), which held 11,708,872.218564 USDT.  The virtual currency associated with the Subject Address is hereinafter referred to as the "Defendant Property."

16.     The United States has yet to take custody and control over the Defendant Property, which was voluntarily frozen by Tether.

## STATEMENT OF FACTS

### Background on Cryptocurrency

17.     **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

18.     **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual

currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

19.    **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

20.    **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

21.    **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

22.    **Virtual Currency Wallet:** A virtual currency wallet (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send

6

and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

23.    **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

24.    **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

25.    **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

26.    **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

27.    **Ether:** Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

28.    **Dai:** Dai ("DAI") is a "stablecoin" virtual currency with its value tied to the US dollar. DAI is issued by the decentralized autonomous organization MakerDAO.

### Background on Cryptocurrency Investment Fraud

29.    The USSS and FBI through the Memphis Virtual Currency Task Force ("MVCTF") are investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2024 alone, more than 41,000 complaints of CIF were received by the FBI's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia.

30.    In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

31.    Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual

---

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2024 at 36,
https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

currency exchange, such as Coinbase or Crypto.com, and then walks the victim through transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, all deposited funds are actually routed to a virtual currency address controlled by the criminals.

32.     In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**Overarching CIF Investigation Involving the SUBJECT VIRTUAL CURRENCY ADDRESS**

33.     This investigation began when a victim, named "R.T." ("Victim-1") reported to law enforcement that they[3] had been duped into sending over $506,000 in cryptocurrency to an address provided by an unidentified suspect on a fraudulent investment website.

34.     By investigating this fraudulent investment platform, the MVCTF was able to identify and trace other cryptocurrency transactions that were connected to other victims, who

---

[3] Throughout this complaint, "they" and "their" in reference to individual victims to avoid sharing any unnecessary identifying information about them.

were also tricked into depositing cryptocurrency into addresses provided by the fraudulent investment platforms, similar to the one Victim-1 utilized to send their money. The funds from other victims were then traced into the SUBJECT VIRTUAL CURRENCY ADDRESS.

35.    In sum, based on the victims' reports, investigation of the fraudulent investment platforms they used, and the tracing of those victims' funds to the SUBJECT VIRTUAL CURRENCY ADDRESS, the funds contained in the SUBJECT VIRTUAL CURRENCY ADDRESS are believed to be proceeds of CIF wire fraud schemes, further described below, and are commingled with funds that are involved in the concealment of those proceeds as part of a money laundering scheme. Therefore, the funds in SUBJECT VIRTUAL CURRENCY ADDRESS are subject to forfeiture as further set forth in this complaint.

**Victim-1**

36.    In or around December 2021, Victim-1 received an unsolicited text message on WhatsApp from a woman who went by the name Lin Xixi. Lin stated she lived in Hong Kong and had mistakenly texted Victim-1 instead of her business partner who she said lived in Los Angeles, CA. Lin and Victim-1 continued to chat through WhatsApp and engaged in what Victim-1 believed was a relationship.

37.    After some time of chatting, Lin mentioned to Vicitim-1 that they should diversify their investments and start trading cryptocurrency. Lin introduced Victim-1 to cryptocurrency using a fraudulent app called UBAY (https://ubaytld[.]com) and Victim-1 began investing with Lin's guidance.

38.    Victim-1 began with small investments consisting of $200 to $500 utilizing UBAY and made a profit according to the fraudulent app. With the fake success of their first few investments, Lin encouraged Victim-1 to put in more capital to obtain a higher profit. Victim-1 then reportedly added all their liquid cash, approximately $40,000, utilizing UBAY.

10

39. Lin then encouraged Victim-1 to add more funds. Victim-1 reportedly decided to withdraw approximately $500,000 from their retirement account. Victim-1 stated that they originally kept approximately $175,000 to pay the IRS for the taxes on the early withdrawal. Unfortunately, Victim-1 was also lured into sending the remaining $175,000 to pay fake "taxes" to their earnings on the platform.

40. After multiple deposits and seeing their investments appear to grow, Victim-1 attempted to make a withdrawal of their funds. The attempt was denied, and they were instructed to pay 10% of their balance for a "risk deposit" within 10 working days or UBAY would begin deducting 0.1% of their assets. Victim-1 was reportedly told that the risk deposit would be returned if paid in a timely manner. At this point Victim-1 became suspicious that they were being scammed and attempted to contact UBAY customer support. The only support UBAY allegedly offered was online chat support and it had no phone number or email address for communication. Since the MVCTF last communicated with Victim-1, no funds have been returned to Victim-1.

41. Victim-1 advised investigators they deposited approximately $325,000 worth of ETH on or about January 20, 2022, to 0xe97abf29e454154a1d59b022ac53b4580cad69a4 ("69a4"), an address provided by the scammers.

42. Once the launderers sent approximately 109.6 ETH was from 69a4 to 0xf881c35a8b7a3cd8fb71fee1b3de351a1bdc5b4e ("5b4e"), the launderers converted the ETH to USDT using the decentralized VCE Tokenlon. The launderers then sent 313,921 USDT from 5b4e to 0x49db66dc0b8d8a88b3ea713a51811463f142a034 ("a034"). After a034 received the USDT, the USDT was laundered to and through two additional addresses before landing in SUBJECT VIRTUAL CURRENCY ADDRESS in a transaction worth approximately 1,000,000 USDT on or about February 18, 2022, with approximately 313, 921 of that USDT being traceable to Victim-1.

Approximately $200,000 worth of USDT traceable to Victim-1 still remains in the SUBJECT VIRTUAL CURRENCY ADDRESS. Exhibit 1, below, shows how Victim-1's funds were laundered into the SUBJECT VIRTUAL CURRENCY ADDRESS using a string of virtual currency addresses.

**Exhibit 1 – Summary of the Flow of Funds from Victim-1 to SUBJECT VIRTUAL CURRENCY ADDRESS**



### Victim-2

43.     The MVCTF also received a report from the family of Victim-2, reporting that Victim-2 was a victim of a cryptocurrency investment scam and lost over $3,200,000. Based on the family's reports, Victim-2 received an unsolicited text message on WhatsApp regarding cryptocurrency investment opportunities. From on or around April 2023 to on or around September 2023, Victim-2 reportedly communicated with an individual described as a cryptocurrency "guide" based in Beijing, China, named "Ashley Tan" ("Tan").

44.     Tan instructed Victim-2 on how to open accounts at various virtual currency exchanges so that they could trade and earn returns on their cryptocurrency investments. Once Victim-2 began trading, Tan would recommend that they speak with Kraken[4] customer service to handle or settle any issues that would arise. Once Victim-2 transferred funds from their bank

---

[4] Kraken is a popular U.S.-based cryptocurrency exchange.

account to Kraken, the fraudsters would then direct Victim-2 to send the funds directly to a virtual currency address.

45.     After a series of wire transfers, the fraudsters informed Victim-2 that they were being investigated by the United States Securities and Exchange Commission (SEC) for insider trading on cryptocurrency platforms. The fraudsters, then purporting to be from the SEC, told Victim-2 that if they did not pay an additional $180,000 "fine" by September 25, 2023, for insider trading, they would be seizing all his assets.

46.     On or about September 25, 2023, Victim-2 committed suicide, and told their family about the scam in a note left behind.

47.     Victim-2's family advised investigators that Victim-2 transferred approximately $205,000 worth of ETH on or about September 13, 2023, from 0xf8cb7dec8bc28f3d2dfeb5e6f4484365be56f5e4 ("f5e4"), which was controlled by Victim-2, to 0x422d03e5cb100c7b440701e9ed044e064c9fad66 ("ad66"), an address provided by the scammers. Investigators then traced approximately $200,000 worth of USDT of Victim-2's funds from ad66 to the SUBJECT VIRTUAL CURRENCY ADDRESS, where the funds remain. Before being laundered into the SUBJECT VIRTUAL CURRENCY ADDRESS, Victim-2's ETH was converted to DAI and from DAI to USDT via Tokenlon (as displayed in Exhibit 2 below).

**Exhibit 2 – Summary of the Flow of Funds from Victim-2 to SUBJECT VIRTUAL CURRENCY ADDRESS**



**Additional Victim Funds Traced to SUBJECT VIRTUAL CURRENCY ADDRESS**

48.    Including Victims 1 and 2 described above, the MVCTF identified 25 individuals suspected of being victims, who had sent a combined amount of approximately $15 million in cryptocurrency to a group of addresses that ultimately deposited a portion of their funds into the SUBJECT VIRTUAL CURRENCY ADDRESS. The MVCTF has contacted and heard back from 12 of these individuals and received records from the virtual currency exchanges where they held accounts used to withdraw funds to make what they believed to be investments as part of CIF schemes. Engagement with these victims all revealed that they were victimized in similar scams bearing the hallmarks of typical CIF schemes, such as being contacted by strangers online who developed an online relationship with the victims, who encouraged them to invest in cryptocurrency on one or more platforms introduced by the scammer(s), and the victims believed they were making strong returns on their "investments" until they ultimately tried to withdraw funds or withdraw larger sums of their funds, when they ultimately realized they were being scammed.[5]

49.    The MVCTF identified that these 25 confirmed/suspected victims made approximately $15,467,717.00 in total deposits as part of these schemes. The MVCTF traced these individuals' funds on the blockchain and identified that approximately $3,052,832.00 of these funds were ultimately sent to the SUBJECT VIRTUAL CURRENCY ADDRESS's current balance after being transferred through multiple common intermediary and consolidation virtual currency addresses.

---

[5] This group of 25 individuals is referred to below as "confirmed/suspected victims," which includes the 12 individuals or their families that the MVCTF has successfully made contact with and confirmed as victims, and 13 individuals who the MVCTF has not been able to confirm are victims but who are believed to likely be victims based on the analysis of the flow of their funds and the investigation described in this affidavit.

50.     On or about April 10, 2024, Tether froze the SUBJECT VIRTUAL CURRENCY ADDRESS in response to a voluntary freeze request made by the MVCTF after tracing CIF victim funds into the address. Exhibit 3, below, outlines each of these 25 confirmed/suspected victims' withdrawals made to CIF schemes and the amount of these funds traced to the SUBJECT VIRTUAL CURRENCY ADDRESS' currently frozen balance. Exhibit 4, below, shows the network of addresses that some of these victims' funds were sent to and through before reaching the SUBJECT VIRTUAL CURRENCY ADDRESS.[6]

---

[6] Note that Victim-2's laundered funds did not pass through any of the identified consolidation wallet addresses depicted in Exhibit 4, below.

**Exhibit 3 – Confirmed/Suspected Victims' Deposits to CIF Schemes and Amount of Scheme Proceeds Traced to the SUBJECT VIRTUAL CURRENCY ADDRESS (all values approximate)**

| Victim | Amount Deposited to Scheme | Proceeds Traced into SUBJECT VIRTUAL CURRENCY ADDRESS |
|---|---|---|
| 1 | $323,123.00 | $200,000.00 |
| 2 | $205,190.00 | $199,630.00 |
| 3 | 12,475,230.00 | $500,000.00 |
| 4 | $99,764.00 | $96,411.00 |
| 5 | $118,504.00 | $118,504.00 |
| 6 | $49,992.00 | $49,816.00 |
| 7 | $98,723.00 | $98,723.00 |
| 8 | $59,665.00 | $59,665.00 |
| 9 | $49,966.00 | $49,966.00 |
| 10 | $49,425.00 | $49,425.00 |
| 11 | $99,979.00 | $48,000.00 |
| 12 | $150,480.00 | $150,480.00 |
| 13 | $220,814.00 | $220,814.00 |
| 13 | $77,943.00 | $77,943.00 |
| 13 | $58,806.00 | $58,806.00 |
| 13 | $266,328.00 | $130,000.00 |
| 14 | $100,654.00 | $100,654.00 |
| 15 | $98,049.00 | $98,049.00 |
| 16 | $14,625.00 | $14,625.00 |
| 17 | $28,939.00 | $28,939.00 |
| 18 | $97,808.00 | $97,808.00 |
| 19 | $210,620.00 | $206,000.00 |
| 20 | $93,873.00 | $79,470.00 |
| 21 | $97,648.00 | $79,470.00 |
| 22 | $176,666.00 | $94,731.00 |
| 23 | $96,223.00 | $96,223.00 |
| 24 | $48,680.00 | $48,680.00 |
| 25 | 68,852.00 | 0.00 |
| Total | **$15,467,717.00** | **$3,052,832.00** |

**Exhibit 4 – Example Flow of Funds for Some of the 28 Victims**



51.    In addition to these 25 confirmed/suspected victims, the MVCTF believes that it has identified an additional 45 likely victims of CIF scams whose funds are believed to have been commingled with some of the 25 confirmed/suspected victims' funds when the funds were being sent through the intermediary addresses between the initial deposit addresses for the CIF scams and the SUBJECT VIRTUAL CURRENCY ADDRESS. These individuals were identified through victim complaints made to IC3, reports made to the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), victim reports made to virtual currency exchanges (that the MVCTF reviewed), and additional back-tracing from virtual currency addresses provided by victims who were defrauded.

### Subject Funds' Involvement in Money Laundering Offenses

52.    As described above, 25 confirmed/suspected victims' funds are traceable to the Subject Funds. These victims were defrauded as part of wire fraud schemes, in violation of Section 1343 of Title 18, United States Code, when unidentified subjects knowingly participated in a scheme to defraud them, in part by using materially false and/or fraudulent pretenses, representations, and promises that their cryptocurrency deposits were for legitimate cryptocurrency investments, and these pretenses, representations, and promises were conveyed to the victims through the use of wire communications in interstate or foreign commerce—i.e., messages over various U.S.-based message applications, wireless carriers, and social media providers.

53.    In addition to committing these wire fraud violations, subjects and/or their co-conspirators also committed money laundering offenses. First, based on the MVCTF closely investigating CIF scams over the past several years, and based on significant amounts of open source reporting, almost all CIF scam operations involving the solicitation and initial transfer of

victim funds are believed to emanate from foreign-based individuals.[7] Therefore, the unidentified subjects are believed to have committed international promotional money laundering, in violation of Section 1956(a)(2)(B)(i) by transferring funds from a place in the U.S. (victims' cryptocurrency purchased through U.S. virtual currency exchanges) to virtual currency addresses controlled outside of the U.S., knowing that the funds involved in the transfers represented wire fraud proceeds from U.S. victims, and to conceal the nature, location, source, ownership or control of the wire fraud proceeds. Additionally, as described further below, the purported owner of the SUBJECT VIRTUAL CURRENCY ADDRESS is a foreign national located overseas.

54. Furthermore, based on analysis of the transaction activity involving the subject-controlled addresses that first received the victims' funds, the multiple intermediary addresses that later received, commingled, and consolidated confirmed/suspected victims' funds (including with funds of unidentified origins), and the SUBJECT VIRTUAL CURRENCY ADDRESS which held and still currently holds millions of dollars' worth of cryptocurrency, these addresses were used in a coordinated fashion to make transactions designed to conceal the nature, location, source, ownership, or control of wire fraud proceeds.

55. Such transaction activity, for example, is seen through the transfer of Victim 2's funds, as displayed in Exhibit 2. After Victim 2's funds were sent to a subject-controlled address (ending in "f5e4") on or about September 13, 2023, Victim 2's funds were rapidly sent to four additional cryptocurrency addresses within roughly less than a day and a half. The funds then stayed in one of those addresses before being sent along to five additional addresses, all within the

---

[7] *See e.g.,* Lily Hay Newman & Matt Burgess, *The Pig Butchering Invasion Has Begun*, WIRED (Sept. 30, 2024, 6:00 AM), https://www.wired.com/story/pig-butchering-scam-invasion/, ("Such "pig butchering" operations have largely been concentrated in Myanmar, Cambodia, and Laos, typically rooted in Chinese organized crime groups exploiting instability and poor governance in the region. . . . [P]ig butchering operations that are offshoots of the Southeast Asian activity have emerged in the Middle East, Eastern Europe, Latin America, and West Africa.")

span of about six days, before being transferred to the SUBJECT VIRTUAL CURRENCY ADDRESS. Before being sent to the SUBJECT VIRTUAL CURRENCY ADDRESS, Victim 2's funds were swapped for USDT, which is very common as scammers are able to stabilize the value of their proceeds by converting them to a stablecoin which pegs its value to the U.S. dollar.

56.    Criminals will often conduct multiple otherwise unnecessary transactions in the transfer of funds, incurring transaction costs, to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of quick transfers between these intermediary addresses and ultimately to SUBJECT VIRTUAL CURRENCY ADDRESS is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud). There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring Bitcoin (BTC) or USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees, or "gas" fees, required by the Ethereum blockchain. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

57.    These intermediary addresses made many high-value transactions, followed by a pattern of rapid movement of funds with large corresponding withdrawals. Each intermediary address has a zero, or very low, USDT balance, and most stopped being used after confirmed /suspected victims' funds were laundered through them. From the time of these intermediary addresses' first use, on average, each transferred approximately $27 million in cryptocurrency.

These intermediary addresses each have direct and indirect exposure[8] to other known CIF addresses, addresses with community complaints made in a reliable blockchain analytics tool used by law enforcement and the private sector, addresses linked to reported fraudulent websites, and addresses that have held funds frozen by a stablecoin issuer.

58.     Additionally, based on the MVCTF's experience investigating other CIF scams, the transaction patterns displayed in Exhibit 4 are very commonly seen in CIF laundering investigations, with victims' funds from multiple different deposit addresses being funneled into a common consolidation address (e.g., the address ending in "a034") before being sent to multiple additional intermediary addresses prior to being deposited into the SUBJECT VIRTUAL CURRENCY ADDRESS. The common path of several of the confirmed/suspected victims' funds shows that these addresses were part of a network of addresses that were used to receive and conceal wire fraud proceeds.

**SUBJECT VIRTUAL CURRENCY ADDRESS' Ownership and Connection to a Binance Account**

59.     As described further below, the SUBJECT VIRTUAL CURRENCY ADDRESS is purportedly owned and controlled by an individual who also claimed ownership of a VCE account held at Binance (THE BINANCE ACCOUNT). The first withdrawal from SUBJECT VIRTUAL CURRENCY ADDRESS was sent to THE BINANCE ACCOUNT.

60.     During the analysis of blockchain activity associated with SUBJECT VIRTUAL CURRENCY ADDRESS, the MVCTF identified two transactions from the SUBJECT VIRTUAL CURRENCY ADDRESS to THE BINANCE ACCOUNT. The two transactions were small and

---

[8] "Direct exposure" refers to when a virtual currency address directly receives funds from or directly sends funds to another address. "Indirect exposure" measures the services and entities that make up the origins or destinations of funds in a specific virtual currency address' transactions in cases where there are non-service addresses (e.g., unhosted addresses) between the specific virtual currency address and those services or entities.

appear to be test deposits. It is very common for cryptocurrency users to initiate small test deposits to other addresses they control before sending larger amounts of cryptocurrency.

61.    The MVCTF also analyzed transactions from THE BINANCE ACCOUNT to the SUBJECT VIRTUAL CURRENCY ADDRESS. THE BINANCE ACCOUNT initiated two withdrawals to the SUBJECT VIRTUAL CURRENCY ADDRESS. One of these withdrawals was a transaction in ETH, marking the very first deposit into the SUBJECT VIRTUAL CURRENCY ADDRESS. This type of deposit is commonly referred to as a "gas" deposit, providing the ETH needed to pay gas fees needed to send cryptocurrency on the Ethereum blockchain.[9] Virtual currency addresses sending and receiving gas deposits typically have a common owner.

62.    The gas payments from THE BINANCE ACCOUNT to the SUBJECT VIRTUAL CURRENCY ADDRESS included the initial amount used to "startup" the SUBJECT VIRTUAL CURRENCY ADDRESS, and additional gas fee payments (via small amounts of ETH sent) throughout the usage period of the SUBJECT VIRTUAL CURRENCY ADDRESS, enabling the address to continue sending virtual currency, including victims' funds.

63.    The subsequent transactions from the SUBJECT VIRTUAL CURRENCY ADDRESS involved two withdrawals back to THE BINANCE ACCOUNT.

64.    Records received from Binance revealed that THE BINANCE ACCOUNT was registered to a user named Nan Pan, who provided a Chinese identification card for verification purposes to open the account.

65.    Approximately $612,136 in funds from 23 confirmed and suspected CIF victims was traced into THE BINANCE ACCOUNT.

---

[9] As discussed earlier, in the Ethereum network, "gas" refers to the unit that measures the amount of computational effort required to execute operations such as transactions or smart contracts.  Gas fees are necessary for initiating and confirming transactions within the network.

66.    On or about August 28, 2024, the MVCTF received an email from an attorney claiming that their client, Nan Pan, owned both THE BINANCE ACCOUNT and SUBJECT VIRTUAL CURRENCY ADDRESS. The MVCTF has yet to receive any information from Ms. Pan or her attorney that conflicts with the assessment that both the SUBJECT VIRTUAL CURRENCY ADDRESS and THE BINANCE ACCOUNT were used for money laundering purposes.

### COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(C))

67.    The Defendant Property includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

68.    Accordingly, the Defendant Property is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

### COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(A))

69.    The Defendant Property constitutes property involved (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

70.    Accordingly, the Defendant Funds are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why

24

the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney


/s/ Rick Blaylock, Jr.
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

## VERIFICATION

I, Morgan Morgan, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this __29__ th day of __April__ 2026.

Morgan Morgan
Special Agent
United States Secret Service